1

2

3

4                       UNITED STATES DISTRICT COURT

5                      NORTHERN DISTRICT OF CALIFORNIA

6

7   T.H.,[1]                                    Case No.  19-cv-04684-JCS

              Plaintiff,

8

9         v.                                    **ORDER RE MOTIONS FOR**
                                                **SUMMARY JUDGMENT**
10  ANDREW SAUL,                                Re: Dkt. Nos. 12, 17

              Defendant.
11

12  **I.      INTRODUCTION**

13        Plaintiff T.H. brings this action challenging the final decision of Defendant Andrew Saul,

14  Commissioner of Social Security, (the "Commissioner") denying T.H.'s application for disability

15  benefits after a hearing before an administrative law judge (the "ALJ").  The parties filed cross

16  motions for summary judgment pursuant to Civil Local Rule 16-5.  For the reasons discussed

17  below, T.H.'s motion is GRANTED, the Commissioner's motion is DENIED, and the matter is

18  REMANDED for further proceedings consistent with this order.[2]

19  **II.     BACKGROUND**

20        **A.      Medical Record**

21        In his initial application, T.H. claimed to be disabled due to epilepsy, a shoulder injury,

22  nerve damage in his left hand, and tinnitus.[3]  Administrative Record ("AR," dkt. 11) at 82.  He

23  _____

24  [1] Because opinions by the Court are more widely available than other filings, and this order
    contains potentially sensitive medical information, this order refers to the plaintiff only by his
25  initials.  This order does not alter the degree of public access to other filings in this action
    provided by Rule 5.2(c) of the Federal Rules of Civil Procedure and Civil Local Rule 5-
26  1(c)(5)(B)(i).
    [2] The parties have consented to the jurisdiction of the undersigned magistrate judge for all
27  purposes pursuant to 28 U.S.C. § 636(c).
    [3] The ALJ's decision and the parties' arguments focus on T.H.'s epilepsy and shoulder injury.
28  This summary of the medical record is therefore confined to those two conditions; it is not a
    complete recitation of T.H.'s medical record.

United States District Court
Northern District of California

United States District Court
Northern District of California

alleges an onset date of August 3, 2013.  *Id*. at 83.

### 1.  Seizures and Epilepsy

T.H. had his first seizure when he was an 18- or 19-year-old freshman in college.  AR at 513.  On January 31, 2013, T.H. was seen in the Stanford Hospital Emergency Department after suffering a seizure.  *Id*. at 554–57.  Dr. Matthieu Declerck wrote that T.H. did not recall the seizure but remembered being in an ambulance.  *Id*. at 554.  Besides being "[p]ositive for seizures and syncope," the review of T.H.'s systems was normal.  *Id*. at 555.  He also reported "occasionally" taking Ativan and Xanax as well as a daily dose of Wellbutrin for anxiety.  *Id*.

On August 3, 2013, T.H. arrived at the Stanford Hospital emergency room after having a seizure and fracturing the humerus bone in his left arm while he was being arrested for a missed court date and a broken tail light.  *Id*. at 513, 525–26.  T.H. tested positive for cocaine, benzodiazepines, and THC.  *Id*. at 530.  T.H. had a second "large tonic-clonic seizure" while in the emergency department.  *Id*. at 522.  He fell and suffered some bleeding, but it was "controlled." *Id*.  RN Rhodora Ann Orciga noted that neurology resident Velez recommended against starting medication for seizures "in light of active cocaine use and negative head CT."  *Id*. (emphasis omitted).  T.H. reported to physician assistant Lisa Ryder on August 12, 2013 that he suffered a third seizure after being discharged from the hospital back into police custody and may have fallen on the ground during the seizure; she noted "[g]iven the severity of his seizures this is very probable."  *Id*. at 516.

At the Boswell Clinic on August 16, 2013, T.H. told Dr. George Nune that "stress may trigger events."  *Id*. at 513. Dr. Nune wrote:

> Myoclonic jerks occurred prior to both the latter seizures and have occurred in isolation since the age of 18. They cause him to drop objects and he describes them as similar to being startled. No absence-like episodes. The patient has no memory for the seizures after to the buildup of myoclonic jerks and was confused following them.

*Id*.  T.H. noted that he could anticipate when a seizure was "imminent" because he experienced a "buildup of myoclonic jerks."  *Id*.  Dr. Nune noted that T.H. was "[a]wake, but appears drowsy with psychomotor slowing, oriented to person, place, time, and situation."  *Id*. at 514.  Dr. Nune noted that a CT scan of T.H.'s head taken on August 3, 2013 was "normal."  *Id*.  In an August 17,

1    2013 visit to the emergency department, T.H.'s mother reported that he was compliant with his

2    medication. *Id*. at 511.

3           T.H. underwent an EEG on October 10, 2013. *Id*. at 476–77. Overall, the EEG was

4    "normal." *See id*. at 435.

5           On May 25, 2014, T.H. returned to the emergency room with a seizure which was

6    proceeded by an aura that a seizure was coming. *Id*. at 438. T.H. reported being mildly confused

7    after the seizure, but was "back at baseline." *Id*. He admitted that he had not taken his anti-

8    seizure medication Depakote for five months and explained, "I don't like pills." *Id*. T.H. reported

9    that he had been under stress when the seizure occurred and that stress was "usually" a trigger for

10   his seizures. *Id*. On June 16, 2014, T.H. called Dr. Scheherazade Le and reported taking

11   Depakote and experiencing side effects of stomach aches, which were improving, and drowsiness.

12   *Id*.

13          Dr. Le saw T.H. on July 14, 2014. *Id*. at 434–36. She described his recent seizure as a

14   "breakthrough seizure in the setting of medication non-adherence." *Id*. at 436. According to Dr.

15   Le, T.H. had not been taking his medication when the May seizure occurred. *Id*. at 434. T.H.

16   began taking Depakote in the aftermath of the seizure, "but has since stopped taking it again." *Id*.

17   at 434. Dr. Le described his previous imaging:

18                8/3/2013 CT Head normal. Underwent neuropsych evaluation in high
                 school which reportedly showed marked depression. EEG 10/10/13
19               normal, MRI brain images reviewed 10/10/13 3T seizure protocol:
                 reviewed and normal.
20

21   *Id*. at 435 (emphasis omitted). T.H. reported that he still experienced depression. *Id.* at 434. Dr.

22   Le suggested a lower dose of Depakote, but T.H. declined to try it. *Id*. at 436. Dr. Le tailored her

23   recommendations to T.H.'s difficulty consistently taking medication: "He has trouble with

24   adherence so although lamotrigine would be a more ideal medication, I do not think he will be

25   able to follow the long titration schedule." *Id*.

26          T.H. had another seizure on June 11, 2015. *Id*. at 411. His mother called Dr. Jyeming

27   Tsao and reported that T.H. had a seizure and that he had not been taking Depakote. *Id*. She was

28   not sure if he was taking Keppra, and could not locate the bottle. *Id*. The next day, clinical nurse

1   specialist Marian Ann Callanan noted that T.H. "had been off all meds as they were not helping."

2   *Id*.

3          T.H. saw Dr. Robert Fisher at the Stanford Comprehensive Epilepsy Center on June 16,

4   2015. *Id*. at 409–10.  T.H. reported frequent myoclonic jerks, which were sometimes followed by

5   seizures.  *Id*. at 409.  When he saw Dr. Fisher, T.H. was taking 500mg of Keppra twice a day after

6   his June seizure, but was still having myoclonic jerks, which he thought were the result of stress.

7   *Id*.  In Dr. Fisher's opinion, T.H.'s June seizure was the result of "increased stress and being off of

8   medication."  *Id*. at 410.  Dr. Fisher confirmed that T.H. would continue to increase his dose of

9   Keppra and, if the Keppra did not work, Dr. Fisher would prescribe 0.5mg of clonazepam

10   "until we can get the Keppra at a therapeutic level."  *Id*. at 410.

11          On July 1, 2015, T.H. suffered another seizure, even though he had not missed any

12   medication.  *Id*. at 408 ("Had a tonic clonic seizure this AM . . . . No missed meds.").  He told

13   CNS Callanan that the clonazepam was working to reduce his myoclonic jerks.  *Id*.  In response to

14   the seizure, Dr. Le increased T.H.'s dosages of Keppra and clonazepam.  *Id*.; *see also id*. at 407

15   ("meds were increased per Dr. Le").  The increased dosage left him "feeling down and not

16   himself."  *Id*. at 401.  Dr. Le adjusted his medication dosages on July 7, 2015.  *Id*.

17          T.H. saw Dr. Le again on September 3, 2015.  *Id*. at 353–55.  Since his visit in June, T.H.

18   "continues to have breakthrough seizures.  He has had about 4-5 grand mal seizures lasting up to 3

19   minutes."  *Id*. at 353.  He was taking Keppra but continued to have adverse side effects, including

20   low mood, but no longer experienced anger or irritability.  *Id*. at 353.  He was taking his

21   clonazepam "as needed."  *Id*.  Dr. Le put T.H. on a trial of the drug lamotrigine to increase over a

22   period of 8 weeks.  *Id*. at 355.

23          T.H. had a seizure on February 29, 2016.  *Id*. at 336–37 (telephone encounter note from

24   March 1, 2016: "Had a seizure last night.").  He was visiting his girlfriend out of state and "may

25   have missed a few doses of clonazepam but has been really good at taking his Keppra."  *Id*. at 337.

26          On May 17, 2016, T.H. was arrested and taken to jail for a probation violation.  *Id*.  The

27   jail doctor told him he would not receive clonazepam.  *Id*.  Nine days later, on May 26, T.H. was

28   out of jail and saw Dr. Le in the Stanford Epilepsy center.  *Id*. at 334–36.  She opined that T.H.'s

United States District Court
Northern District of California

4

"seizures are overall much improved . . . . They are occurring now once every 2-2.5 months." *Id*. at 334. His last seizure occurred while he was in jail and not given clonazepam or levetiracetam. *Id*. As of the May 16 visit, T.H. had not started taking lamotrigine. *Id*. Dr. Le described his lab workup as "unremarkable." *Id*.

T.H.'s mother E.H. called Dr. Addason McCaslin of Stanford Neurology on September 6, 2016 to discuss a "recent increase in seizure frequency lately." *Id*. at 331. E.H. was unsure about the details of T.H.'s medication plan and adherence, but "thinks that he has only been taking 1000mg keppra BID (rather than the prescribed 1500 BID) and suspects he has not been taking lamotrigine at all, likely for several months . . . . He has been taking clonazepam, which help his myoclonic jerks, and this is his preferred method of symptom control." *Id*. Dr. McCaslin told E.H. to tell her son that he was "strongly advised" to take the full dose of Keppra and that he may have to restart the titration of lamictal. *Id*.

On September 26, 2016, T.H. visited Dr. Le. *Id*. at 328–30. She noted an "increased seizure frequency late in September." *Id*. at 328. Dr. Le also noted that T.H. "has been non-compliant with medication but recently has been consistent . . . . He also self-discontinued lamotrigine for a while, but was since restarted." *Id*. Dr. Le reported that T.H. was not having any adverse side effects from his medications and that his depression was controlled. *Id*. However, he was having about two seizures per month, caused by stress and inconsistent medication compliance. *Id*.; *see also id.* at 330 ("His seizure control has recently worsened in the setting of medication non-compliance and stress. He has improved his compliance with his seizure medications."). She also noted his excitement to restart college courses. *Id*.

On October 31, 2016, E.H. called Marian Ann Callanan and told her that T.H. "has been off his Lamictal and clonazepam for the past month as he has been in a facility that only gave him Keppra." *Id*. at 326. A month and a half later, E.H. called Ms. Callanan again and reported that T.H. had two seizures on November 30 and another two seizures on December 14, 2016. *Id*. at 325. Ms. Callanan planned to check T.H.'s level of lamictal. *Id*.

According to Dr. Le's notes from December 19, 2016, at the time of his seizure on December 14, T.H. was not taking his medication consistently. *Id*. at 321 ("He had been setting

United States District Court
Northern District of California

1    an alarm to take his medications, however when his girlfriend is away he forgets to take them or

2    takes them later.").  T.H.'s "[l]ast lamotrigine draw" was "< 1.0" and his Keppra level was "low."

3    *Id*.  Dr. Le suggested that he try an electronic device to decrease the frequency of his seizures.  *Id*.

4    at 323.

5         T.H. saw Dr. Holly Rabideau for a pharmacy medication review on January 10, 2017.  *Id*.

6    at 317–21.  Dr. Rabideau noted that, with the help of his mother and girlfriend, T.H. was feeling

7    more confident about his ability to comply with a medication schedule.  *Id*. at 318.  In addition,

8    T.H. reported "since decreasing his clonazepam, he does not feel less drowsy, but has noticed an

9    increase in an electrical shock/jumpy-type feeling that often precedes his seizures."  *Id*.  Dr.

10   Rabideau's assessment was that T.H. had "idiopathic generalized epilepsy."  She further noted that

11   his seizures "occur often after missed medication doses."  *Id*. at 320.  The doctor was confident

12   that T.H. would be more compliant with his medication schedule moving forward with his

13   mother's help.  *Id*.

14        T.H.'s had a seizure the next day, January 11, after missing his morning dose of

15   medication.  *Id*. at 317.  It was "shorter than usual," and T.H. was "[b]ack to self in 15mins."  *Id*.

16   He had another seizure on February 28, 2017.  *Id*. at 316.  He was taking clonazepam, lamotrigine,

17   and keppra at the time; Ms. Callanan recommended increasing the dose of lamictal if he was not

18   already taking a 400 mg dose daily.  *Id*.

19        On April 12, 2018, T.H saw Dr. Le, who summarized his seizure activity since the

20   beginning of 2017.  *Id*. at 1461–66.  She wrote:

21        2017 Update: Only a few large grand mal seizures. . . . He had a grand
          mal seizure this AM out of sleep, mom says maybe the convulsing
22        lasted for about 90 seconds with post-ictal confusion, fatigue.  He
          thinks it was triggered by the stress of traveling.  He had a grand mal
23        seizure in July when walking in the park in the AM and called his
          mom, he had to take an Uber home though he was very close to his
24        house.  He thinks he may have missed an AM medication.  3/2017:
          Two big seizures this AM out of sleep.  Lasted about 2-3 minutes.  No
25        injuries.  In finals now studying, stress, sleep deprived, no missed
          meds, stress about upcoming surgery.  His mom reports that when he
26        was living with her in February 2017, he was having more frequent
          grand mals, maybe up to 1 per week.
27
          He is able to remember to take the XR medications more often, it is
28        difficult for him to take a pill multiple times per day. . . . He has been

*United States District Court*
*Northern District of California*

6

> setting an alarm to take his medications. . . . Triggers: stress, has had some missed medications but has been inconsistent over the past two months. . . .

*Id*. at 1462–63.  Dr. Le prescribed Zonisamide, a "new medication for seizures."  *Id*. at 1467.

### 2.  Shoulder Injury

When T.H. was admitted to hospital after having a seizure while being arrested on August 3, 2013; he fractured his left humerus and left clavicle and complained of "left shoulder pain and left thumb and index finger numbness."  AR at 526; *see also id*. at 530 ("substantial swelling of the left shoulder, but his left arm is neurologically intact"), 520 ("Has R shoulder pain and feels 'out of socket'").  Dr. Nicholas Giori ordered a CT scan of T.H.'s left shoulder "in preparation for possible surgery in the coming week."  *Id*. at 530.  On August 13, 2013, T.H. reported "reduced sensation near his upper arm."  *Id*.

On August 17, 2013, T.H. told emergency department physician Dr. Thomas Dalton that he was experiencing severe shoulder pain and was doubling the dosages of oxycodone to control it.  *Id*. at 509.  Dr. Dalton consulted the orthopedic surgeon, who "agreed this was likely post-op pain."  *Id*. at 511.  T.H. declined to be readmitted to the hospital for pain control.  *Id*.  At a follow up appointment with Dr. David Lowenberg on August 20, T.H. reported feeling "much better" after being prescribed OxyContin.  *Id*. at 508.  Dr. Lowenberg planned a second procedure for August 26, 2013.  *Id*.

On August 26, Dr. Lowenberg performed surgery to repair T.H.'s rotator cuff and left proximal humerus.  *Id*. at 488–89.  Dr. Lowenberg noted that T.H. "tolerated the procedure well without complications."  *Id*. at 489.   The next day, T.H. reported nine out of ten burning pain in his left shoulder.  *Id*. at 491.  On August 28, two days after his surgery, T.H. was still reporting pain between an eight and a ten out of ten.  *Id*. at 496.  He was discharged that same day.  *Id*. at 497.  T.H. left with a prescription for valproic acid, acetaminophen, lorazepam (Ativan), and promethazine (Phenergan), as well as refills for Oxycontin and Roxicodone.  *Id*. at 498.  At a follow up also on the 28th, Dr. Michael Leong wrote that T.H. reported an average pain of between zero and five out of ten, although his worst pain was a nine out of ten.  *Id*. at 500.  T.H.'s mother asked for more pain medication, but that request was denied due to T.H.'s history of drug

1    abuse. *Id*. at 486.

2           At a therapy consultation on September 27, 2013, Dr. Matthew White noted that T.H.

3    "walks holding his left arm out at a 30-45 degrees, propping it up at times with his right arm, as he

4    says this is more comfortable." *Id*. at 480.  Dr. White also wrote that T.H. reported trouble

5    sleeping because of pain.  *Id*.

6           At a follow up appointment on November 5, 2013, Dr. Lowenberg wrote:

7                  [T.H.] is doing much better. He is taking perhaps 2 Norco per day.
                   This is a huge improvement.  He is going to Physical Therapy more
8                  and doing very well with this.  He is functioning much better. . . . On
                   examination today, his left arm has no swelling.  This is a marked
9                  improvement.  His would has completely healed.  Shoulder motion
                   causes really no pain. . . . X-rays of his left shoulder show good bone
10                 bridging of the fracture with the hardware in lace in anatomic
                   position.  This is doing well.
11

12   *Id*. at 474 (emphasis omitted).  Overall, Dr. Lowenberg found that T.H. was "healing nicely."  *Id*.

13          T.H. visited Westcott Physical Therapy on October 1, 2013; he was seen by Dr. Sara

14   Grafil, who completed an initial evaluation.  *Id*. at 1350–52.  He reported "5-6/10" pain along with

15   throbbing and tingling in his left hand.  *Id*. 1351–52.  Dr. Grafil noted that T.H. would need

16   physical therapy, but opined that his prognosis was "excellent."  *Id*. at 1352.  T.H. saw Dr. Grafil

17   twenty times between October 3, 2014 and January 30, 2014.  *Id*.  At his first two visits, T.H.

18   experienced an "[i]mproved" passive range of motion ("PROM").  *Id*. at 1355.  T.H. worked with

19   Dr. Grafil to return to work.  *Id*. at 1357 ("Will be returning to work part time with a 10# lift limit

20   . . . . Feeling better in the last few days.  Will return to work next week.").  On December 16,

21   2013, T.H. had gone back to work, which was "going pretty well."  *Id*.  In January of 2014, T.H

22   had begun exercising at the gym and running.  *Id*. at 1358.  At the end of January, Dr. Grafil noted

23   that T.H. had an "[i]mproved" active range of motion ("AROM").  *Id*. at 1359.

24          On February 4, 2014, Dr. Lowenberg noted that T.H. was "doing fairly well clinically."

25   *Id*. at 471.  Dr. Lowenberg's physical examination showed that T.H. had 60 degrees external and

26   internal rotation with "mild pain" and that T.H. had "passive elevation to 125 degrees without

27   difficulty."  *Id*.  at 472.  T.H. was "using his arm much more freely."  *Id*.  Dr. Lowenberg also

28   ordered an x-ray, which he described as "just fine except the internal rotation view."  *Id*.  In light

of these findings, Dr. Lowenberg ordered a CT scan.  *Id*.  Dr. Lowenberg reviewed the CT scan with T.H. and his mother, which showed a nonunion defect requiring bone grafting surgery.  *Id*. at 470; *see also id*. at 468 ("He underwent a CT 2/5/14 which showed incomplete healing." (emphasis omitted)).

T.H. underwent another surgery on March 10, 2014.  *Id*. at 455–65.  Dr. Jason Martin, an occupational therapist, opined that T.H.'s rehabilitation potential was "very good."  *Id*. at 460.  At a follow up appointment on March 26, 2014, Dr. Lowenberg noted that T.H. was doing "fairly well" and "maintains a normal motor and sensory exam in his left upper extremity."  *Id*. at 453.  Dr. Lowenberg "started the patient with gentle physical therapy."  *Id*. (emphasis omitted).  A month later, on April 22, 2014, Dr. Lowenberg took additional x-rays which showed that the bone graft was "in place" and "healing nicely."  *Id*. at 451.  In addition, Dr. Lowenberg recorded that, according to T.H., his pain was well controlled and, while he still experienced some pain, his shoulder pain was "diminished."  *Id*.

After his March surgery, T.H. returned to Dr. Grafil for post-operative therapy.  *Id*. at 1359–61. T.H.'s arm was consistently sore, particularly after he twisted it "while riding his long board."  *Id*. at 1359–60.  By May 20, 2014, one of the screws in his shoulder "backed out," requiring an additional surgery on May 22, 2014.  *Id*. at 449.  At a preoperation examination, T.H. told physician's assistant Lisa Ryder that he "was doing better until a couple of weeks ago when he stumbles & jerked his arms forward," and although "he did not fall on his arms," his shoulder and upper arm pain increased after that incident.  *Id*. at 447.

On June 5, 2014, after the May surgery, Dr. Grafil reported that T.H.'s "[s]houlder is feeling better since [the surgery] but he fell on it the other day so it has been a little sore since, but not too bad."  *Id*. at 1360.  A month later, on July 15, T.H. "report[ed] that [his] shoulder is feeling pretty good.  He is looking for a job and feels his shoulder will be strong enough for this."  *Id*. at 1361.

Dr. Michael Fisherman and Dr. Einar Ottestad saw T.H. in the Stanford Pain Management Center on October 8, 2014.  *Id*. at 427–31.  He was referred to the pain management center because of his requested for a repeat prescription of Norco, which he claimed his roommate stole.

1   *Id*. at 428.  T.H. reported that the intensity of his pain was "8/10 on average, 10/10 at worst" and

2   that the pain was exacerbated by "Bedrest, Exercise, Massage, Movement, Physical therapy and

3   'work'." *Id*. (emphasis omitted).  The doctors recommended "one time pain physical therapy" and

4   referred him to a therapist.  *Id*.  T.H. later told Dr. Lowenberg that pain management was "not

5   helpful." *Id*. at 427.

6        T.H. returned to Dr. Lowenberg on November 25, 2014 "after having missed 4 prior

7   appointments." *Id*.  T.H reported that he had not been engaging in physical therapy and that he

8   "has not been motivated to do so himself." *Id*.  At this appointment, T.H. had good motion below

9   the shoulder in his left arm but had difficulty raising his left arm above shoulder level.  *Id*.  He was

10  also "clearly weak in external rotation." *Id*.  Dr. Lowenberg reported that T.H.'s x-rays showed

11  "definite improvement." *Id*.  However, the x-ray did reveal "slight high riding of the humeral

12  head." *Id*.  Dr. Lowenberg ordered an ultrasound to assess T.H.'s rotator cuff.  *Id*.  The ultrasound

13  ultimately showed "rotator cuff tendinitis and interstitial tearing." *Id*. at 425.

14       T.H. received an initial evaluation from Dr. Sonia Saini, DPT, on December 9, 2014.  *Id*. at

15  1353–54.  Dr. Saini observed "no significant changes since last session." *Id*. at 1361.  T.H.

16  described the severity of his pain as a six to seven out of ten.  *Id*. at 1353.  Dr. Saini recorded that

17  T.H.'s pain was aggravated by any movement and that his functional limitation was "recreation,"

18  which she noted was "baseball." *Id*.  Her diagnosis was that T.H.'s pain had increased since his

19  left shoulder surgery; his prognosis was "fair based on progression." *Id*. at 1354.

20       On January 1, 2015, T.H. saw Dr. Lowenberg to discuss the ultrasound findings.  *Id*. at

21  425.  At that visit, Dr. Lowenberg noted that T.H. "clearly has stiffness of his shoulder and pain."

22  *Id*.  Dr. Lowenberg gave T.H. an injection in his shoulder, which provided "significant relief." *Id*.

23  at 426.  Later, on February 24, 2015, Dr. Lowenberg ordered a CT scan in light of the increased

24  pain and "x-rays showing worsening lucency around the hardware" in T.H.'s shoulder.  *Id*. at 424.

25  According to Dr. Lowenberg, on March 11, 2015, the CT showed:

26       areas of spot welding with no haloing around the screws and no
     hardware failure.  However, there is still persistent nonunion around

27       the fracture with sclerotic edges.  There is no clear evidence on the
     CT scan of avascular necrosis.  This is more just of the nonunion.  The

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

patient continues with pain, and this is actually worsening by his description.

*Id*. at 423 (emphasis omitted).  Dr. Lowenberg recommended another bone graft and referred T.H. to Dr. Aimee Der-Huey Shu, an endocrinologist.  *See id*.

T.H. saw Dr. Shu on March 13, 2015.  *Id*. at 419–23. She recorded worsening pain over the past two months in T.H.'s left arm, which he was "[b]arely able to lift over [his] head."  *Id*. at 419. Dr. Shu ordered tests to determine whether "correctable hormone or nutritional imbalances" were hindering T.H.'s bone healing.  *Id*. at 422.

At an April 14, 2015 meeting with Dr. Lowenberg, T.H. reported persistent nine out of ten pain in his shoulder.  *Id*. at 417–18.  Dr. Lowenberg reviewed an x-ray and a CT scan, which did not indicate problems with bone density, problems with the hardware in his shoulder, or humeral head osteonecrosis, but revealed that the nonunion issue persisted.  *Id*. at 417.  Dr. Lowenberg hypothesized that T.H.'s failure to heal and persistent, severe pain were the result of a chronic infection.  *Id*.  The doctor told T.H. and his mother that additional surgeries would be needed.  *Id*. at 418.  T.H.'s next surgery was scheduled for July 20.  *Id*.

Doctor Lowenberg performed T.H.'s surgery on July 20, 2015.  *Id*. at 381–96.  T.H. returned to Dr. Lowenberg and PA Meenal Mistry on August 5, 2015; Dr. Lowenberg opined that T.H. "could return to work on August 10."  *Id*.  He also scheduled a preoperative assessment for another surgery: a bone grafting of the left proximal humerus.  *Id*.  At a pre-operative examination with PA Mistry, T.H. reported "some slight decreased sensation to the radial and medial nerve distribution. . . . He has decreased range of motion of his left upper extremity as well."  *Id*. at 374. On August 24, 2015, T.H. underwent what, by his count, was his seventh surgery.  *Id*. at 364. T.H.'s surgery was "without complications," *id*. at 358, and his rehab potential was "very good," *id*. at 365.

T.H. returned to the Stanford pain clinic on September 17, 2015 and saw Dr. Pamela Dru Flood.  *Id*. at 347–51.  He told Dr. Flood that his pain was a seven out of ten on average and that it was aggravated by "movement and physical therapy."  *Id*. at 348 (emphasis omitted).  He also noted that "the pain interferes with work, exercise and lifting."  *Id*.  Under "Pain Beliefs," T.H. indicated that he felt the pain impacted his life because it prevented him from working or going to

11

1    school.  *Id*.  Dr. Flood referred T.H. for an ultrasound.  *Id*. at 351.

2         At an appointment with Dr. Lowenberg on September 30, T.H. signaled that he was "ready

3    and would like to engage in on physical therapy."  *Id*. at 342 (emphasis omitted).  The doctor

4    dictated that T.H. should not bear weight on his left shoulder for an additional month.  *Id*.  Dr.

5    Lowenberg prescribed physical therapy.  *Id*.  T.H.'s physical therapy evaluation with Brendan

6    Pesa was on October 12, 2015.  *Id*. at 339–42.  Mr. Pesa noted "the patient has limitations with

7    being able to tolerate overhead motions of the [upper extremity] and any most ADL's requiring

8    [left upper extremity] movement.  The patient can benefit from skilled PT to increase [range of

9    motion] and strength deficits to maximize return to [prior level of functioning]."  *Id*. at 340.  T.H.

10   told Mr. Pesa that his pain was a five out of ten and aggravated by "lifting arm overhead, reaching

11   behind the back, performing dressing [activities], reaching out to the side, twisting, [and] reaching

12   back."  *Id*.  T.H. told PA Mistry at an office visit on October 28, 2015 that physical therapy

13   aggravated his pain.  *Id*. at 339.  X-rays from that visit showed improvement.  *Id*.

14        Dr. Lowenberg examined T.H. on January 6, 2016 and noted that T.H.

15            is more freely using his shoulder. . . . The patient is more freely using
             his arm today. . . . the patient has active elevation to 120 degress of
16            his left shoulder. I can passively flex his shoulder to 145 degrees
             today. At 90 degrees abduction, he has 50 degrees internal rotation
17            and 60 degrees external rotation with mild pain. He has a negative
             drop-arm test. He can actively touch the L1 spinous process with only
18            mild pain. His rotator cuff seems to be functioning well. The shoulder
             moves as a unit. There is no focal tenderness about the shoulder.
19

20   *Id*.  Ultimately, Dr. Loweberg noted that T.H. was making "slow, but constant improvement."  *Id*.

21        Seven months later, on August 10, 2016, T.H. returned to Dr. Lowenberg reporting

22   increased pain starting in June.  *Id*. at 332–33.  According to Dr. Lowenberg's progress notes,

23   T.H.'s "pain is specifically with activity and he was working as a server, and developed shoulder

24   pain where he could not lift his shoulder.  He now notes loss of motion with pain and difficulty

25   using his left shoulder."  *Id*.  When he examined T.H., Dr. Lowenberg found that, at 80 degrees of

26   abduction, T.H. was limited to 45 degrees of external rotation and 40 degrees of internal rotation.

27   *Id*. at 333.  Dr. Lowenberg opined that T.H. was "having worsening of what seems like his rotator

28   cuff tendonitis."  *Id*.  He referred T.H. to Dr. Gary Fanton.  *Id*.

United States District Court
Northern District of California

12

T.H. told Dr. Faton "that over the last 3-4 months he has now had increasing pain and difficulty with overhead activities." *Id*. at 331.  Dr. Fanton assessed that T.H. was experiencing "cuff insufficiency."  *Id*. at 332.  Dr. Lowenberg reviewed an MRI from Dr. Fanton on September 27, 2016, which was "suggestive of supraspinatus tendinitis."  *Id*. at 327.

At an orthopedic clinic follow-up on November 10, 2016 with Dr. Abdurrahman Kandil, T.H. presented:

> left shoulder pain and dysfunction, status post proximal humerus fracture complicated by nonunion and infection in the past.  He is here for MRI follow up.  Continues to have constant pain.  Continues to affect his [activities of daily living] and [quality of life].  Affecting his sleep.  Having a hard time having his pain controlled.  Also complaining of numbness of lateral shoulder and index to small fingers. . . .  MRI Left shoulder shows significant metal artifact making it difficult to delineate the rotator cuff.

*Id*. at 326 (emphasis omitted).  Dr. Kandil referred T.H. for an electromyography ("EMG") of his upper left extremity, which occurred on December 19, 2016.  *Id*. at 323–26.  According to Dr. Joshua Levin, the EMG, nerve condition study, and needle examination were all "[n]ormal."  *Id*. at 324.

T.H. landed on his shoulder when he fell out of bed during a seizure on December 14, 2016.  *Id*. at 321.  At a "recheck" with Dr. Fanton on January 31, 2017, T.H. could "only abduct about 70-75 degrees."  *Id*. at 316.  T.H. told Dr. Fanton that Dr. Lowenberg referred him because of a rotator cuff injury and told him he wanted a surgery to fix this, but Dr. Fanton declined to commit to surgical intervention because the most recent MRI was not clear.  *Id*. at 316–17.

On March 21, 2017, physical therapist Lance Westcott wrote a note regarding T.H.'s limitations:

> - He will have great difficulty sustaining work with his upper extremities for longer than 45 min without rest
> - He will have great difficulty lifting more than 5 points with his upper extremities.
> - He is currently able to sit still for no more than 30 min without a change of position due to his neck pain and neural symptoms.

*Id*. at 1473.

T.H. underwent a left shoulder arthroscopy on April 6, 2017.  *Id*. at 1395–97.  Dr. Fanton

13

found a tear in T.H.'s rotator cuff. *Id*. at 1398; *see also id*. at 1430 (describing the procedure).  At a follow up appointment on May 2, 2017, Dr. Fanton noted that, during the surgery T.H.'s "shoulder range of motion was not very good" at the time of his surgery. *Id*. at 1451. Nevertheless, T.H. was making some progress both in his range of motion and his pain management. *Id*.

A year later, on April 13, 2018, Mr. Westcott opined that T.H.'s "symptoms are clearly getting worse." *Id*. at 1472.  In his opinion, T.H.'s "ability to maintain a job is severely limited." *Id*. According to Mr. Westcott, T.H. could only perform work activities that were fifteen minutes or fewer in duration, could only lift less than five pounds, and could only maintain a single position, including sitting, for up to fifteen minutes. *Id*.

### 3.  Self-Function Report and Third-Party Report

On July 1, 2017, T.H. completed a function report describing his disabilities and their effect on his ability to work:

> Unable to lift left arm above shoulder
> Unable to carry or lift heavy objects
> Multiple surgeries/bone grafts/with Long recovery periods.
> Seizures are preceeded by "jumps" make public job difficult.
> *side effects of seizure meds
> *constant L shoulder pain
> *when server could not bring plates to table or open bottle of wine
> pain makes everything difficult
> *pain effects ability to sleep

*Id*. at 264.  During his typical day, T.H. would eat, go for walks, attend physical therapy, watch TV, and attend an online class. *Id*. at 265.  He took medications several times daily. *Id*.  Since his injury, he could no longer raise his left arm, focus, or perform strenuous activities like playing sports or lifting heavy weight. *Id*.  The shoulder pain, nighttime seizures, and stress kept him awake at night. *Id*.  He reported that he had to perform personal care tasks like dressing, bathing, hair grooming, shaving, feeding himself, and using the toilet with one hand. *Id*.

T.H. reported that he needed reminders to take his medication because, due to efforts to find an effective combination, his dosages changed frequently. *Id*. at 266.  Since his injury, he could "only prepare easy microwave meals" like soup and frozen foods. *Id*.  When asked about chores, T.H reported that he could do laundry and "straighten [his] house out," but could not

perform "hard labor." *Id*.  His ability to do housework and yardwork was hindered by his "shoulder pain and limited range of motion." *Id*. at 267.

When T.H. went outside "daily," he used public transportation because his seizures prevented him from driving. *Id*.  He was able to shop in stores. *Id*.  T.H. reported that he could handle money but had "[n]o money to pay bills." *Id*.  His hobbies included watching television, walking his dog, and going "out with friends" once or twice a month, but he needed someone to give him a ride. *Id*. at 268.  He wrote that, before his illness and injury, he "could work out" and "play competitive sports at a high level," but since his injury and starting medication for his seizures, he "stay[ed] home more – worried about having a seizure" or shoulder pain. *Id*. at 268–69.

T.H. checked boxes indicating that he had trouble lifting, reaching, completing tasks, concentrating, remembering things after seizures, understanding, and using his hands. *Id*. at 269.  He wrote that his medication affected his ability to follow instructions. *Id*.  He wrote he was groggy for up to forty-eight hours after a seizure, and "[s]ometimes exhausted from not sleeping due to pain." *Id*.  His attention span ranged between half an hour and two hours. *Id*.  Following written instructions was difficult when he was tired, and his ability to follow spoken instructions varied with the complexity of the instructions and his seizure activity. *Id*.

T.H. wrote that he did not have trouble getting along "with bosses [and] teachers," but that he was "afraid of police." *Id*. at 270.  He handled changes to his routine "ok," but he assessed his ability to handle stress as "[n]ot great" due to his surgeries, lack of money, and seizures." *Id*.  In addition to his fear of police, he was "afraid of being in public and having [a] seizure." *Id*.  He checked a box indicating that he used a brace or a splint, prescribed by his doctor after a bone graft, while he was recovering from surgery. *Id*.  He listed his medications: Keppra, which he wrote made him "slow"; Lamotrigine; and Klonopin, which caused stomach upset, nausea, and severe fatigue. *Id*. at 271.

T.H.'s mother E.H.—who is a pharmacy doctor, *id*. at 293—filled out a seizure questionnaire on her son's behalf on June 30, 2017. *Id*. at 250–52.  She wrote that her son had been having "about one [seizure] per month" for the past eight years. *Id*. at 250.  She reported that

15

1    T.H. had two seizures on February 28, 2017 and single seizures on March 10, April 25, May 17,

2    and July 2 of 2017.  *Id*.  During these seizures, T.H.'s mother indicated that he lost consciousness

3    and bit his tongue.  *Id*.  Each seizure usually lasted for two minutes.  *Id*.  After each seizure, E.H.

4    wrote that her son felt "confused, disoriented, exhausted, [and] in pain from falling," with "sore

5    muscles" and "tongue injuries."  *Id*.  It usually took him twenty-four hours before he could resume

6    his normal activities.  *Id*.

7           E.H. wrote that T.H. was taking 2 grams of Keppra, 20 mg of Lamotrigine, and

8    Clonazepam.  *Id*. at 251.  He had been taking this dosage for a year, but had been on these

9    medications for about seven years.  *Id*.  When asked how well the medications worked to control

10   T.H.'s seizures, she replied "[i]t really depends.  He takes the meds but stress can elicit a seizure

11   regardless."  *Id*.  According to E.H., T.H. always took his medications.  *Id*.

12          E.H. also filled out a third part function report for her son.  *Id*. at 255–62.  She summarized

13   his limiting conditions:

14          LEFT SHOULDER DISABILITY – [T.H.] has had 7 surgeries to
            repair broken bones in his arm/shoulder.  The bones wouldn't
15          "bridge" (re-connect) and he suffered a bone infection.  His most
            recent surgery was to repair his rotator cuff.  EACH surgery recovery
16          takes months of physical therapy, and the pain, sleeplessness, lack of
            ability to move normally or comfortably.  Most recent [surgery] was
17          April 5, 2017.  He cannot bear or lift weight and he does not have
            normal range of motion.
18
            SEIZURES – These prevent [T.H.] from driving and impact
19          productivity and activity.

20   *Id*. at 255.  She described T.H.'s typical day: "Eats, takes meds 3x/day, I drive him or he takes a

21   taxi/uber to appointments (doctor, PT), sometimes he takes a class at the community college."  *Id*.

22   at 256.  T.H. did not take care of any pets or other people.  *Id*.  Since his injury and illness, E.H.

23   wrote that T.H. could not do hard physical labor.  *Id*.  The limitations in T.H.'s shoulder prevented

24   him from working as a waiter, she explained, because "management won't hire him because he

25   can't bear weight."  *Id*.  In addition, E.H. wrote that that pain kept T.H. from sleeping and that the

26   side effects of his seizure medication interfered with his sleep schedule.  *Id*.

27          T.H. prepared his own meals each day, his mother said, but he mostly prepared frozen

28   food; he cooked less since his injury.  *Id*. at 257.  He also did laundry.  *Id*.  However, E.H.

United States District Court
Northern District of California

16

reported that her son needed "support in frustration of inability to work." *Id*.  T.H. went outside daily and was able to go out alone, but did not drive because of his seizures. *Id*. at 258.  Instead, he walked or used public transportation to shop in stores for groceries. *Id*.  E.H. reported that T.H.'s hobbies were limited to reading and watching television, while before his injury he had been "a competitive athlete." *Id*. at 259.  She noted that T.H. could not raise his left arm above his waist without pain. *Id.*

Socially, E.H. reported that her son would "occasionally" go to the movies and to "get food," and regularly took walks and went to doctors' appointments. *Id*.  He needed rides to these activities. *Id*.  She reported that he did not have any problems getting along with others, but that he was "isolated from friends who continue to live [an] active lifestyle," and that he experienced constant pain and feared "having [a] seizure in public." *Id*. at 260.

According to E.H., her son's injury affected his ability to lift and reach. *Id*.  In addition, for two or three days after a seizure, T.H. had trouble with memory, completing tasks, concentration, understanding, following instructions, and using his hands. *Id*.  E.H. reported that her son's ability to pay attention and to follow spoken instructions depended on the day, his pain and medications, and his seizures *Id*.  Consistent with T.H.'s own report discussed above, E.H. wrote that T.H. got along well with authority figures like teachers and bosses "but is afraid of police." *Id*. at 261.  T.H.'s reaction to stress, according to his mother, was depression. *Id*.  She added that T.H. experienced "[l]ots of stress from pain, surgeries, no money, [and] feelings of unsatisfaction with life." *Id*.  E.H. reported that her son handled changes in his routine "[f]ine." *Id*.

After his surgery, T.H. used a brace. *Id*.  He also took the medication Keppra, which E.H. wrote caused "extreme fatigue and sleepiness," lamotrigine, which caused "confusion," and klonopin, which caused "GI upset [and] nausea." *Id*. at 262.

E.H. also submitted a declaration discussing her experience with T.H.'s seizures:

> I quickly find him and he is shaking intensely and his body is very stiff. His eyes are open and he has a very wild look in them, as if he is terrified. His face goes from red to almost blue over the course of the first minute. There is drool and often blood coming from his mouth (from biting his lip, tongue, or inside of his cheek). The sounds

1

is of someone pushing breath out hard through teeth, with saliva making a bubbling sound. . . .

2

3

Once the shaking/seizing stops, I try and sit him up. He is completely confused for awhile. . . . He will sleep for a couple hours. If he was up when it starts, he doesn't seem to know what happened and if I ask him basic questions – what year is it, what's the dog's name, where are you – I get varied results. Sometimes he knows some answers, sometimes none. That lasts for a few hours. I would say the slowness lasts for 2 days.

4

5

6   *Id*. at 293–94.  She cited a doctor's appointment "30 hours" after a seizure on November 30, 2017

7   where T.H. "wasn't able to articulate his concerns or update [the doctor] accurately.  He said he

8   just couldn't really think clearly."  *Id*. at 294.  His seizures also exacerbated his shoulder pain and

9   sometimes resulted in other injuries.  *Id*.

10                   **4.  Consultative Physician's Opinions**

11          Dr. Andrea Allen and Dr. Bill Hennings assessed the record on April 4, 2017, in

12   connection with T.H.'s initial application for disability benefits.  *Id*. at 82–105.  Dr. Hennings

13   found that T.H. had the following severe medically determinable impairments: major joint

14   dysfunction, epilepsy, and autism spectrum disorder.  *Id*. at 86.  Dr. Allen found that, while T.H.

15   had some exertional limitations, he could occasionally lift up to twenty pounds and frequently lift

16   ten pounds, and that he could sit, stand, and walk for "[a]bout 6 hours in an 8-hour workday."  *Id*.

17   at 88.  Dr. Allen opined that T.H. would be limited in his ability to push and pull in his left upper

18   extremities.  *Id*.

19          Dr. Allen also indicated that T.H. would "have postural limitations."  *Id*.  She opined that

20   T.H. could only climb ramps or stairs and crawl "[o]ccasionally" and that T.H would be unable to

21   climb ladders, ropes, or scaffolds, due to his "significant shoulder injury" and neurological

22   disorder.  *Id*. at 89.  T.H.'s ability to lift objects overhead with his left hand was also limited.  *Id*.

23   Finally, T.H. should "[a]void concentrated exposure" to hazards such as machinery and heights.

24   *Id*. at 90.

25          At the reconsideration stage, Dr. Leigh McCary and Dr. Joshu Boyd reviewed the record

26   and agreed with Dr. Allen and Dr. Hennings's assessment of T.H.'s limitations and their ultimate

27   conclusion that he was not disabled.  *Id*. at 108–16.

28

18

1

2

3

4

5

6

7

8

9

10

11

United States District Court
Northern District of California

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**B.     Initial Denial of Application**

T.H. filed his initial application on January 26, 2017.  AR at 192.  He alleges an onset date of August 3, 2013.  *Id*.  This initial application was denied on April 19, 2017.  *Id*. at 140–44.

After the initial denial, T.H. filed a request for reconsideration on June 16, 2017.  *Id*. at 145.  This, too, was denied on August 9, 2017.  *Id*. at 146–50.  He requested an administrative hearing on August 16, 2017.  *Id.* at 152–53.

**C.     Administrative Hearing**

ALJ Hoskins Hart held a hearing on April 30, 2018.  AR at 35.  T.H.'s parents appeared with him for emotional support, but did not testify.  *Id*. at 37–38.  While T.H.'s attorney had prepared an opening statement, the ALJ directed him to file it as an exhibit rather than deliver it in court.  *Id*. at 40–43 (discussing the opening statement).

The ALJ first examined T.H. about his work history as a server in restaurants.  *Id*. at 43.  He replied that his first such job was at Olive Garden starting in 2013; he worked there part-time during the school year and full-time over the summer.  *Id*. at 44.  T.H. told the ALJ he held the position on and off for three years.  *Id*.  Back then, T.H. explained, he sometimes needed help to lift or carry things over twenty pounds: "Sometimes, I would have another employee carry out a meal for me, but usually, I could carry it below my -- below my waist . . . as long as it's not above my head."  *Id*. at 45.  After his time at Olive Garden, T.H. worked at a pizza restaurant and a wing restaurant, where he was not required to lift more than twenty pounds.  *Id*. at 46–47.  He stopped working in 2016 because he suffered a seizure.  *Id*.  Since then, T.H. testified that had been working part-time as a "club promoter" where he handed out fliers advertising nightclubs.  *Id*. at 48–49.  This job did not require him to perform any lifting.  *Id*. at 51.  Finally, he described working part-time as a barista, where he had difficulty lifting things.  *Id*. at 52–53.  T.H. testified that he stopped working after his surgery and did not anticipate that his condition would improve such that he could return to work.  *Id*. at 54.

The ALJ then asked T.H. about his educational background.  He graduated from Gunn High School in 2011 and started college "in Washington State."  *Id*. at 55–56.  He had since transferred first to Foot Hill College and then to Mesa College, a community college in San Diego,

19

1    where he was enrolled part-time at the time of the hearing.  *Id*. at 56–57.  He testified that he did

2    not have a valid driver's license because of a DUI.  *Id*. at 57–58.  Even before the DUI, however,

3    T.H. did not drive often because of his epilepsy.  *Id*. at 58.  His primary method of transportation

4    was public buses.  *Id*. at 59.

5         T.H. explained that, before the onset of his alleged disability, he enjoyed playing baseball

6    but that he was no longer able to do so since his shoulder injury.  *Id*.  Since 2015, he testified, his

7    only activities were work and school.  *Id*. at 60.  He described his typical day: "I will be going to

8    work as a promoter.  Looking for other jobs during the day, a lot of that . . . ."  *Id*.  During the

9    period he was getting surgeries, he did not work.  *Id*. at 60–61.

10        According to T.H., in the two years before the hearing, he received medical treatment at

11   Stanford Hospital or the Palo Alto Medical Foundation.  *Id*.  He saw doctors at Stanford for his

12   arm and his epilepsy.  *Id*. at 62.  He described the difficulty he had with his arm since his alleged

13   onset date:

14        [M]y left arm is pretty much just here for looks.  Like it really doesn't
          do anything.  I have to use my right arm to move it.  Even when I'm
15        eating, I have to literally like use my right hand to bring food to my
          face.  And so it's going to be in pain -- I mean it's in a little bit of pain
16        from waking up until the end of the day that just a little bit of work
          will definitely exacerbate that pain.
17

18   *Id*.

19        T.H. was then questioned by his attorney, who asked him to confirm that he suffered from

20   two disabling conditions: shoulder pain and epilepsy.  *Id*.  With regard to his shoulder injury, T.H.

21   guessed that his physical therapist recommended he limit any lifting to under ten pounds and

22   maintain work activity for less than an hour.  *Id*. at 62–63.  T.H. testified that he did not recall the

23   physical therapist recommending any limitations on sitting.  *Id*. at 63.

24        Despite having "[t]en or eleven" shoulder surgeries, T.H. reported that his shoulder still

25   felt the way it had before the surgeries.  *Id*.  He described the pain as "just like being punched in

26   the arm . . . permanently."  *Id*.  In addition, he described having a severe grand mal seizure

27   "[a]bout once every two or three weeks."  *Id*.  at 64.  It took him "about a full day, 24 hours" to

28   recover.  *Id*.  He didn't drive because of his seizures.  *Id*.  He took at least five medications to

United States District Court
Northern District of California

20

1  manage them.  *Id*. at 64–65.  When T.H. had seizures, he fell to the ground, shook, and was not

2  able to communicate.  *Id*.  He'd had these seizures for seven or eight years, or since he was 18.  *Id*.

3          T.H. testified that, when he worked, he earned about $12 per hour, but that he lost his job

4  as a waiter because of the limitations in the use of his arm.  *Id*.  at 65–66.  He also lost a job at

5  Buffalo Wild Wings because he had a seizure before he came into work and was penalized for not

6  calling and not showing up.  *Id*.

7          The ALJ then heard from Linda Ferra, a vocational expert ("VE") and rehabilitation

8  counselor.  *Id*. at 66.  She described T.H.'s past work as a waiter, informal, DOT 311.477-030, as

9  a semi-skilled job requiring light exertion and with an SVP level of three.  *Id*. at 67.  His other past

10 work, as an "advertising material distributor," DOT 230.686-010, was an unskilled job with an

11 SVP of 2 that requires light exertion.  *Id*. at 68.  Finally, his work as a barista translated to the

12 DOT listing for "counter attendant lunchroom or coffee shop . . . DOT 311.477-014," an unskilled

13 job with an SVP of 2 requiring light exertion.  *Id*. at 68.

14         The ALJ posed the following hypothetical:

15             [A]ssume a hypothetical individual, who has the same vocational
               profile as the Claimant, as far as, age, education, prior work
16             experience. . . . [A]ssume the individual was limited to light exertion,
               but they could only occasionally crawl or climb stairs and ramps, but
17             never climb ladders, ropes or scaffolds.  And they could use the left
               upper extremity for only occasional pushing or pulling or overhead
18             reaching.  And had to avoid any concentrated or frequent exposure to
               hazards, such as unprotected heights, moving machinery or large open
19             bodies of water.  Would this hypothetical person be able to perform
               any of the Claimant's prior work experience?
20

21 *Id*. at 68–69.  The VE testified that she thought such a person would be able to perform T.H.'s past

22 work.  *Id*. at 69.  In addition, the VE listed additional entry level jobs that such a person could

23 perform, such a cashier II, a light, unskilled job with an SVP of 2 and approximately 900,000 jobs

24 nationally; a counter attendant, which had 100,000 jobs nationally; and an advertising material

25 distributor, which had 60,000 jobs nationally.  *Id*. at 69–70.  The VE testified that additional

26 limitations requiring the hypothetical person to "avoid all exposures to hazards in the work

27 setting" would not change her assessment.  *Id*. at 70.

28         The ALJ added a "limitation to simple repetitive tasks, characteristic of unskilled work at

                                          21

United States District Court
Northern District of California

1    all reasoning levels of unskilled work." *Id.* at 70–71.  The VE replied that such an additional

2    limitation "would eliminate the waiter/waitress job because at a semi-skilled level, but the other

3    three would be consistent with that." *Id.* at 71.

4          T.H.'s attorney asked the VE whether her opinion would change if the hypothetical

5    claimant could only perform work activity in fifteen minute increments, was limited to lifting less

6    than five pounds, and if the claimant could only maintain a sitting position for fifteen minutes. *Id.*

7    at 72.  The VE replied that any of those limitations would mean that the jobs she previously

8    mentioned would not be available to a claimant.  *Id.*  T.H.'s attorney then asked "if the Claimant

9    experienced continuing pattern of grand mal seizures, occurring from time to time for more than

10   once a month, would that change your answers?" *Id.*  The VE replied that it would: "if someone

11   were absent more than once a month, then that would not be consistent with competitive

12   employment." *Id.*  She also testified that a limitation to "part-time activity" would not allow for

13   competitive employment.  *Id.* at 73.

14         T.H.'s attorney argued in closing that T.H. was disabled in two ways: his shoulder and his

15   epilepsy.  *Id.*  The attorney offered his summary of T.H.'s limitations and noted that, in his

16   opinion, the medical evidence indicated that T.H. could not engage in substantial gainful

17   employment.  *Id.* at 73–75.

18        **D.    Regulatory Framework for Determining Disability**

19         When a claimant alleges a disability and applies to receive Social Security benefits, the

20   ALJ evaluates the claim using a sequential five step process.  20 C.F.R. § 404.1520(a)(4).  At step

21   one, the ALJ determines whether the applicant is engaged in "substantial gainful activity."  20

22   C.F.R. § 404.1520(a)(4)(I).  Substantial gainful activity is "work activity that involves doing

23   significant physical or mental activities . . . that the claimant does for pay or profit." 20 C.F.R.

24   § 220.141(a)–(b).  If the claimant is engaging in such activities, the claimant is not disabled; if not,

25   the evaluation continues at step two.

26         At step two, the ALJ considers whether the claimant has a severe and medically

27   determinable impairment.  Impairments are severe when "there is more than a minimal limitation

28   in [the claimant's] ability to do basic work activities." 20 C.F.R. § 404.1520(c).  If the claimant

1    does not suffer from a severe impairment, they are not disabled; if the claimant have a severe

2    impairment, the ALJ proceeds to step three.

3           At step three, the ALJ turns to the Social Security Administration's listing of severe

4    impairments (the "Listing").  *See* 20 C.F.R. § 404, subpt. P, app. 1.  If the claimant's alleged

5    impairment meets one of the entries in the Listing, the claimant is disabled.  If not, the ALJ moves

6    to step four.

7           At step four, the ALJ assesses the claimant's residual functional capacity, or "RFC," to

8    assess whether the claimant could perform their past relevant work.  20 C.F.R. § 404.1520(a)(1).

9    The RFC is a determination of "the most [the claimant] can do despite [the claimant's]

10   limitations."  20 C.F.R. § 404.1520(a)(1).  The ALJ considers past relevant work to be "work that

11   [the claimant] has done within the past fifteen years, that was substantial gainful activity, and that

12   lasted long enough for [the claimant] to learn how do to it."  20 C.F.R. § 404.11560(b)(1).  If the

13   claimant is able to perform past relevant work, they are not disabled; if they are not able to

14   perform such past relevant work, the ALJ continues to step five.

15          At the fifth and final step, the burden shifts from the claimant to prove disability to the

16   Commissioner to "identify specific jobs existing in substantial numbers in the national economy

17   that the claimant can perform despite [their] identified limitations."  *Meanel v. Apfel*, 172 F.3d

18   1111, 1114 (9th Cir. 1999) (citing *Johnson v. Shalala*, 60 F.3d 1428, 1432 (9th Cir. 1995)).  If the

19   Commissioner is able to identify such work, then the claimant is not disabled; if not, the claimant

20   is disabled and entitled to benefits.  20 C.F.R. § 404.1520(g)(1).

21        **E.    The ALJ's Decision**

22          The ALJ found that T.H. was not disabled.  AR at 16.  Although she determined that he

23   had not engaged in substantial gainful activity during the relevant period and that he had severe

24   impairments related to his shoulder injury and epilepsy, she concluded that those impairments did

25   not meet or equal the severity of Listing 1.02, for joint dysfunction, or Listing 11.02, for epilepsy.

26   *Id.* at 18–20.  In determining that he did not meet the epilepsy listing, the ALJ relied on T.H.'s

27   failure to take his medication consistently.  *Id.* at 20.

28          She assessed his RFC as follows:

*United States District Court*
*Northern District of California*

23

1

2

3

4

> [P]erfom light work as defined in 20 CFR 404.1567(b) and 416.967(b) except for: no more than occasionally crawl or climb stairs and ramps; can never climb ladders, ropes, and scaffolds; no more than occasionally use the left upper extremity to push, pull, or reach overhead; must avoid all exposure to workplace hazards such as unprotected heights, moving machinery, and large, open bodies of water.

5

*Id*. at 21.

6          First, the ALJ found T.H.'s testimony to be "not entirely consistent with the medical

7   evidence and other evidence in the record." *Id*. at 22.  She found that T.H.'s testimony about the

8   disabling severity of his seizures and arm pain was not supported by the "unremarkable imaging

9   studies" in the record and was "inconsistent with the objective examinations showing improved

10  musculoskeletal findings and substantially normal neurological findings." *Id*. (citing *id*. at 565,

11  569, 640–41, 1439, 1451, 1464).  The ALJ also noted that T.H.'s symptoms responded to

12  conservative treatment. *Id*. (citing *id*. at 318, 1353, 1358, 1360, 1439, 1464).  Finally, she noted

13  that T.H. "reported a wide range of functional activities including working at various part-time

14  jobs, earning college credits, traveling in and out of state, taking public transportation, living with

15  roommates, and long-board surfing."[4] *Id*. (citing 1360–61, 1464, 1472; Hearing Testimony).

16          The ALJ explained that the record supported her finding that T.H. could perform light

17  work. *Id*. She pointed to the imaging results of T.H.'s arm and shoulder, which she described as

18  "unremarkable." *Id*. at 23 (citing *id*. at 565–66).  She noted that imaging of T.H.'s brain showed

19  "no significant abnormalities" and that his EEG was "normal in wakefulness and sleep." *Id*.

20  (citing *id*. at 641–42; 645).  Next, the ALJ wrote that "physical examinations . . . do not support

21  the level of [symptom] intensity as alleged." *Id*.  The ALJ noted that the record showed T.H.'s

22  shoulder pain, range of motion, and strength improved after his surgery and that neurological

23  examinations yielded normal findings. *Id*. (citing *id.* at 541–42, 565–66, 645).  In addition, the

24  ALJ pointed to periods of improvement in T.H.'s symptoms, particularly during periods of

25

26  [4] The ALJ's reference to surfing appears to be a misunderstanding of references in the record to T.H. using a "long board." *E.g.*, AR at 1360.  In context, it appears that T.H. used a longboard-
27  type *skateboard*. *See, e.g.*, *id.* at 64 ("I've fallen down, just skateboarding . . . .").  The Court has not identified any reference in the record to T.H. surfing.  The distinction is potentially relevant to
28  T.H.'s claimed disability based on his shoulder impairment in that skateboarding does not inherently require arm strength or range of shoulder motion to the same extent as surfing.

United States District Court
Northern District of California

medication compliance and physical therapy.  *Id*. (citing *id*. at 316, 318–20, 1355, 1358, 1360, 1439, 1466).  Finally, the ALJ found that T.H.'s daily activities, including attending college classes, exercising, and living independently with roommates, were not consistent with his claimed level of disability.  *Id*. at 23–24.

The ALJ then explained that she afforded "significant weight" to the opinions of medical consultants Dr. Allen and Dr. "L. Carey," which the Court understands to be an erroneous reference to Dr. Leigh McCary.  *Id*. at 24 (citing *id*. at 88–91, 100–03, 114–19, 129–33); *see id*. at 118 (identifying Dr. McCary).  According to the ALJ, the agency consultants' opinions were consistent with the rest of the record:

> The opinions are supported by the record as a whole including the examinations reflecting improved musculoskeletal findings and substantially normal neurological findings, along with stable symptoms with treatment compliance.  In addition, they are consistent with the claimant's reported daily activities.

*Id*. (internal citations omitted).  Further, she noted that Dr. Allen and Dr. McCary had experience and understanding of "Social Security programs and regulations."  *Id*.  The ALJ noted, however, that T.H. should avoid "all exposure to workplace hazards" because of his epilepsy.  *Id*.

The ALJ gave "little to no weight" to the opinion of Mr. Westcott, T.H.'s physical therapist, because his opinion was "unsupported by the record as a whole and inconsistent with contemporaneous treatment notes."  *Id*. at 24.  First, the ALJ questioned whether Westcott treated T.H. at all given that T.H.'s physical therapy progress notes were written by Dr. Grafil and Dr. Saini.  *Id*. (citing *id*. at 1347–64, 1470–75).  She further noted "the claimant admits to abilities exceeding the limitations Mr. Westcott assessed."  *Id*.  Finally, the ALJ discounted the physical therapist's opinion because physical therapists are not considered acceptable medical sources.  *Id*. In addition, the ALH gave "less weight" to T.H.'s mother's statements because she found those statements "inconsistent with the overall evidence of the record," specifically with regard to improvement with treatment compliance and T.H.'s daily activities.  *Id*. at 25.

Ultimately, the ALJ determined that T.H. could perform his past work as an informal waiter, which is a semiskilled job requiring light exertion with an SVP of 3.  *Id*. (citing *Dictionary of Occupational Titles* (U.S. Department of Labor, 1991)).  Alternatively, the ALJ wrote, T.H.

United States District Court
Northern District of California

United States District Court
Northern District of California

1  could perform other jobs that exist in significant numbers in the national economy.  *Id*. at 26

2  (citing 20 C.F.R. §§ 404.1569, 404.1569a, 416.969, 416.969a).  The ALJ looked to the testimony

3  of the vocational expert that T.H. could work as a cashier, a counter attendant, or an advertising

4  material distributor.  *Id*. at 26–27.  Because T.H. could perform such gainful employment, the ALJ

5  found that he was not disabled within the meaning of the Social Security Act.  *Id*. at 27.

6      **F.    Issues Presented**

7          The parties' cross motions for summary judgment present the following issues:

8          1.  Whether the ALJ erred by failing to provide a function-by-function analysis of T.H.'s

9              severe impairments;

10         2.  Whether the ALJ's finding that T.H. had severe physical impairments is internally

11             inconsistent with her finding that he is not disabled;

12         3.  Whether the ALJ erred by not accounting for VE testimony based on T.H.'s attorney's

13             hypotheticals regarding T.H.'s epilepsy and shoulder injury;

14         4.  Whether the ALJ erred by considering T.H.'s part time work history;

15         5.  Whether the ALJ provided germane reasons for rejecting Mr. Wescott's testimony; and

16         6.  Whether substantial evidence in the record supports the ALJ's conclusion that T.H.

17             does not meet the SSA listing for epilepsy.

18  **III.    ANALYSIS**

19      **A.    Legal Standard**

20          District courts have jurisdiction to review the final decisions of the Commissioner and may

21  affirm, modify, or reverse the Commissioner's decisions with or without remanding for further

22  hearings.  42 U.S.C. § 405(g); *see also* 42 U.S.C. § 1383(c)(3).

23          When reviewing the Commissioner's decision, the Court takes as conclusive any findings

24  of the Commissioner that are free of legal error and supported by "substantial evidence."

25  Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a

26  conclusion" and that is based on the entire record.  *Richardson v. Perales*, 402 U.S. 389, 401.

27  (1971).  "'Substantial evidence' means more than a mere scintilla," *id*., but "less than

28  preponderance."  *Desrosiers v. Sec'y of Health & Human Servs.*, 846 F.2d 573, 576 (9th Cir. 1988)

26

1    (internal citation omitted).  Even if the Commissioner's findings are supported by substantial

2    evidence, the decision should be set aside if proper legal standards were not applied when

3    weighing the evidence.  *Benitez v. Califano*, 573 F.2d 653, 655. (9th Cir. 1978) (quoting *Flake v.*

4    *Gardner*, 399 F.2d 532, 540 (9th Cir. 1978)).  In reviewing the record, the Court must consider

5    both the evidence that supports and the evidence that detracts from the Commissioner's

6    conclusion.  *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996) (citing *Jones v. Heckler*, 760

7    F.2d 993, 995 (9th Cir. 1985)).

8        **B.    The ALJ's Opinions Were Not Internally Inconsistent**

9        First, the ALJ's finding that T.H. had severe impairments and her finding that he was not

10   disabled for the purposes of disability benefits are not inconsistent and, therefore, do not

11   themselves constitute reversible error.  The severity finding at step two is a "de minimis screening

12   device to dispose of groundless claims."  *Smolen*, 80 F.3d at 1290.  The severity determination at

13   step two and the disability determination at step five are distinct; "the satisfaction of the

14   requirements at step two does not automatically lead to the conclusion that the claimant has

15   satisfied the requirements at step five."  *Hoopai v. Astrue*, 499 F.3d 1071, 1076 (9th Cir. 2007).

16   Accordingly, the ALJ's findings are not inconsistent and she did not err in this regard.

17       **C.    The ALJ Erred in Dismissing Mr. Westcott's Opinion**

18       The ALJ erred by dismissing the opinion of Mr. Westcott, one of T.H.'s physical

19   therapists.  The opinions of "other" medical sources like Mr. Westcott may only be dismissed

20   when an ALJ provides germane reasons for doing so; because the ALJ's reasons are not supported

21   by the evidence in the record, she erred.

22       Mr. Westcott's status as a physical therapist does not mean the ALJ may dismiss it

23   outright.  "Physical therapists are generally treated as 'other medical sources' under 20 C.F.R. §

24   404.1513(d)(1)."  *Green v. Colvin*, No. 13-cv-05105-WHO, 2014 WL 6066187, at *8 (N.D. Cal.

25   Nov. 13, 2014).  An opinion from an "other medical source" may not be used to establish the

26   existence of a medically determinable impairment, but such a source may be used to determine the

27   severity of a claimant's symptoms once that impairment has been established.  *See id*. at *7 (citing

28   SSR 06-03p)  Mr. Westcott's opinion concerns the severity of an impairment whose existence

United States District Court
Northern District of California

1   was already established by medical sources and accepted by the ALJ.  AR at 18.  Accordingly, the

2   ALJ may only reject his opinion if she provided germane reasons for doing so.  *Ghanim v. Colvin*,

3   763 F.3d 1154, 1161 (9th Cir. 2014) ("While their opinions must still be evaluated, 20 C.F.R.

4   § 404.1527(c), the ALJ may discount testimony from these other sources if the ALJ gives reasons

5   germane to each witness for doing so." (internal citations and quotation marks omitted)); *see also*

6   *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012) (citing *Turner v. Comm'r of Soc. Sec.*, 613

7   F.3d 1217, 1224 (9th Cir. 2010); *Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2001)).

8          The ALJ's conclusion is predicated in part on the ALJ's assertion that Mr. Westcott did not

9   directly treat or evaluate T.H.  *See* AR at 24 ("First, there is no medical evidence that Mr. Westcott

10  treated or evaluated the claimant since physical therapy progress notes of record indicate treatment

11  from Ms. Grafil and Ms. Saini.").  However, the record suggests that Mr. Westcott treated, or at

12  least examined, T.H. during the time he offered his opinions.  On July 3, 2017, Mr. Westcott

13  completed a form evaluating T.H.'s musculoskeletal impairments.  *Id*. at 1459.  In addition to

14  recording findings consistent with his written assessments, Mr. Westcott noted that he examined

15  T.H. up to twice a week after his surgeries from October 1, 2013 through the date of the form.  *Id*.

16  This timeline is consistent with Dr. Fanton's treatment notes from May 2, 2017, which mention

17  ongoing physical therapy.  *Id*. at 1451.  Records from other physical therapists who treated T.H.

18  do not indicate that he was treated by either Dr. Saini or Dr. Grafil past December of 2014.  *See id*.

19  at 1351–61 (treatment notes beginning on October 1, 2013 and ending on December 14, 2014).  It

20  appears that Mr. Westcott is the physical therapist mentioned in Dr. Fanton's notes.  Therefore, the

21  ALJ's reasoning to dismiss Mr. Westcott's report on grounds that he did not personally examine

22  T.H. is not supported by the record.

23         The ALJ also rejected Mr. Westcott's opinion as inconsistent with "objective evaluations

24  [that were] substantially normal" and T.H.'s "symptom improvement with treatment compliance.

25  *Id.* at 24.  In the Ninth Circuit:

26              [i]t is an error to reject a claimant's testimony merely because
               symptoms wax and wane in the course of treatment.  Cycles of
27              improvement and debilitating symptoms are a common occurrence,
               and in such circumstances it is error for an ALJ to pick out a few
28              isolated instances of improvement over a period of months or years

United States District Court
Northern District of California

and to treat them as a basis for concluding a claimant is capable of working.

*Garrison v. Colvin*, 759 F.3d 995, 1017 (9th Cir. 2014).  While the ALJ was correct that some medical records indicated improvement, the ALJ failed to address such records in the context of ongoing limitations and periods of deterioration requiring a large number of remedial surgical procedures, as detailed in the background section above.  The ALJ therefore erred by relying on "isolated instances of improvement" to reject Mr. Westcott's report.  *See id.*

**D.      The ALJ Erred in Finding that T.H. Does Not Meet the Listing for Epilepsy**

In addition, the record does not support the ALJ's conclusion that T.H. does not meet the listing for epilepsy because of his non-compliance with prescribed medication.  To meet listing 11.02 with tonic-clonic seizures, a claimant must show "[g]eneralized tonic-clonic occurring at least once a month for at least 3 consecutive months despite adherence to prescribed treatment." 11.02A.  "'Despite adherence to prescribed treatment' means that you have taken medication(s) or followed other treatment procedures for your neurological disorder(s) as prescribed by a physician for three consecutive months but your impairment continues to meet the other listing requirements despite this treatment."  11.00C.  There is not enough evidence in the record to determine whether T.H. was taking his medication when he continued to have seizures in early 2017 and beyond.

T.H.'s mother E.H. wrote that T.H. had six seizures between February and July of 2017. AR at 250.  According to E.H., these seizures occurred while T.H. was compliant with his medication schedule.  *See id.* at 251 (listing T.H.'s medications and answering "yes" when asked whether T.H. always took his medications).  The record does not contain information supporting or refuting E.H.'s assertion; the only treatment notes available from that period is a summary of all T.H.'s seizure activity from January 2017 to April 2017.  *Id.* at 1461–66.  This summary gives conflicting information as to whether T.H. was compliant with his medication plan when he had these 2017 seizures.  *Compare id.* at 1462 ("He had a grand mal seizure in July . . . He thinks he may have missed an AM medication."); 1463 ("He is able to remember to take the XR medications more often, it is difficult for him to take a pill multiple times per day.") *with id.* at 1462 ("Taking medications regularly. . . . 3/2017: Two big seizures. . . . no missed meds"), 1463 ("He has been setting an alarm to take his medications. . . . has had some missed medications but

United States District Court
Northern District of California

1    has been inconsistent over the past two months").

2         Pinpointing whether T.H. was compliant with his medication and treatment plan when he

3    had seizures in 2017 is critical to determining whether T.H. meets the listing for epilepsy.

4    Accordingly, the case is remanded for further proceedings to determine whether T.H.'s seizures

5    continued through 2017 despite adherence to medication and other treatment and, consequently,

6    whether he meets the listing for epilepsy.

7         The Court notes that the ALJ's conclusion that T.H. did not meet listing 11.02 because of

8    lack of blood serum documentation, AR at 20, is inconsistent with SSA guidelines as articulated in

9    the SSA's Program Operations Manual System ("POMS").  *See* POMS DI 34001.030 ("We do not

10   require serum drug levels; therefore, we will not purchase them. However, if serum drug levels are

11   available in your medical records, we will evaluate them in the context of the other evidence in

12   your case record.").  While agency interpretations in the POMS are non-binding, the Court notes

13   that POMS is a source of persuasive authority and should be treated as such.  *Cf. Lockwood v.*

14   *Comm'r Soc. Sec. Admin.*, 616 F.3d 1068, 1073 (9th Cir. 2010) (referencing the POMS as a source

15   of persuasive authority even as it declined to be persuaded).  Under the relevant section of the

16   POMS, the ALJ would be permitted to consider instances where serum levels appearing in the

17   record demonstrate noncompliance with medication, but may not rely on the *absence* of such

18   documentation.  Here, the ALJ appears to have considered not only some instances of documented

19   noncompliance, but also a broader absence of documented compliance.  *See* AR at 20 ("[T]here is

20   no documentation by blood serum levels of prescription medications that such seizure activity is

21   occurring despite therapeutic levels of prescription medications as required by the listing . . . .").

22   To the extent the ALJ relied on the latter, her analysis is not consistent with the POMS.

23        **E.    Further Proceedings are Appropriate**

24        "When the ALJ denies benefits and the court finds error, the court ordinarily must remand

25   to the agency for further proceedings before directing an award of benefits."  *Leon v. Berryhill*,

26   880 F.3d 1041, 1045 (9th Cir. 2017) (citing *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d

27   1090, 1099 (9th Cir. 2019)).  As explained above, the record is underdeveloped with regard to

28   T.H's progress after his rotator cuff repair and his medication compliance during his seizure

United States District Court
Northern District of California

30

1    activity in 2017.  Further proceedings are therefore required to develop the record.

2         **F.    The Court Does Not Reach T.H.'s Other Arguments**

3         The Court finds that remand is warranted based on the need to further consider and

4    develop the record with regard to both T.H.'s shoulder injury and his medication compliance

5    during periods of seizure activity.  Accordingly, the Court does not address whether the ALJ erred

6    in failing to provide a function-by-function report of T.H.'s limitations or whether the ALJ erred

7    by addressing T.H.'s part time work history.  The Commissioner is encouraged to address these

8    issues on remand.

9    **IV.    CONCLUSION**

10        For the reasons discussed above, T.H.'s motion is GRANTED and the Commissioner's

11   motion is DENIED, and the matter is REMANDED to the Commissioner for further proceedings

12   consistent with this order. The Clerk is instructed to enter judgment accordingly.

13        **IT IS SO ORDERED.**

14   Dated: September 29, 2020

15   _____

16   JOSEPH C. SPERO
     Chief Magistrate Judge

*United States District Court*
*Northern District of California*